CAMPBELL SASH WORKS, INC.,
Plaintiff,

v.

UNITED STATES of America,
Defendant.

CALEX CORPORATION, Plaintiff,

v.

UNITED STATES of America,
Defendant.

Andrew STAVICH, Plaintiff,

v.

UNITED STATES of America,
Defendant.

George and Dorothy STAVICH, Plaintiffs,

v.

UNITED STATES of America,
Defendant.

John and Margaret STAVICH, Plaintiffs,

v.

UNITED STATES of America,
Defendant.

Helen STAVICH, Ex'x, Estate Steve Stavich and Helen Stavich, Plaintiff,

v.

UNITED STATES of America,
Defendant.

Civ. A. Nos. 36935, 36936, C-62-329
to C-62-332.

United States District Court
N. D. Ohio, E. D.
April 2, 1963.

M. R. Schlesinger, Grossman, Schlesinger & Carter, Cleveland, Ohio, Henderson & Covington, Youngstown, Ohio, for plaintiffs.

Merle M. McCurdy, U. S. Atty., Cleveland, Ohio, for defendant.

KALBFLEISCH, District Judge.

The above-captioned six actions were consolidated for trial by previous order of this Court. Civil actions Nos. 36935 and 36936 are actions for the refund of $3,539.77 and $2,557.93, respectively, in FICA, FUTA and withheld income taxes alleged by the taxpayers, Campbell Sash Works, Inc. and Calex Corporation, to have been erroneously and illegally assessed and collected by the Government for the first quarters of 1956, and 1957, plus statutory interest. Civil actions Nos. C-62-329 (Andrew Stavich, Taxpayer), C-62-330 (George and Dorothy Stavich, Taxpayers), C-62-331 (John and Margaret Stavich, Taxpayers), and C-62-332 (Helen Stavich, Extrx., Est. of Steve Stavich and Helen Stavich) are actions for the refund of $502.25, $626.17, $416.89 and $588.08, respectively, of income taxes alleged by the said taxpayers to have been erroneously and illegally assessed and collected by the Government for the taxable years 1956 and 1957, plus statutory interest.

QUESTIONS PRESENTED

The taxes involved in this suit were assessed by the Government and paid by the

plaintiffs. Thereafter the plaintiffs filed claims for refunds, which claims were denied, and these actions resulted. The Government assessed the taxes involved in these actions on the ground that certain amounts expended by Campbell Sash Works, Inc. and the Calex Corporation, for and on behalf of certain employees, constituted "wages" to the corporations' employees.

The ultimate questions are:

1. Were the expenses of the employees, which were paid by the corporations, for the employees' trips to Florida, wages to the employees within the meaning of Sections 3121(a), 3306(b), and 3401(a) of the Internal Revenue Code of 1954?

2. In view of the activities in which the corporate officers engaged in connection with the employees' trips to Florida, did the officers realize income in an amount equal to the cost of the trips, which cost was paid by the corporations? If they did, are they entitled to a corresponding deduction? and

3. Was the cost of the trips the fair market value of the income realized?

## FINDINGS OF FACT

The facts as to jurisdiction and venue are admitted in the pleadings and in a stipulation filed with this Court.

At the trial the parties entered into the following stipulation of facts and supplemental stipulation, which are hereby adopted and made a part hereof:

"It is hereby stipulated and agreed by and between counsel for the respective parties hereto that the facts hereinafter stated are true and correct and that this stipulation may be offered in evidence at the trial of the above cause by either party to this cause with the same force and effect as if the same were duly proved by the testimony of witnesses, reserving to each party the right to question the materiality and rele-

vancy of any fact admitted herein, and reserving to each party the right to offer any additional testimony on any or all of the matters covered in this stipulation not inconsistent with the facts stated herein, in accordance with the rules of practice before the United States District Court.

"*1.* In January of 1956, Campbell Sash Works, Inc., and Calex Corporation defrayed the expenses of a trip to Florida for their employees. All employees who had been employed by either of the corporations for a period of more than three months were eligible to go to Florida. Of 55 employees who were eligible to go to Florida, 46 went as a group and two went later. The plant was closed for production while the group of 46 was away. Of seven eligible employees who did not go, two worked during the period the plant was closed. The two employees who later went to Florida also worked during the period the plant was closed. The foregoing data and names of employees are detailed on Exhibit 'A' attached hereto and made a part hereof.

"*2.* All arrangements for the flight to Florida were made through Capital Airlines. All costs of the trip, including hotel bills (American Plan), sightseeing trips, transportation to and from airports and flight expenses were paid by Capital Airlines. The corporations paid Capital Airlines for all costs of the trips. The total cost of the 1956 trip was $17,715.41. The invoice from Capital Airlines detailing the expenses of the trip is attached hereto, made a part hereof, and marked Exhibit 'B.'

"*3.* In January of 1957, Calex Corporation and Campbell Sash Works, Inc., took their employees to Florida once more. All employees who had been employed by either of the corporations for a period of more than three months were eligi-

ble to go to Florida on the 1957 trip Of 56 employees who were eligible to go to Florida, 40 went as a group and one went later. The plant was closed for production while the group of forty was away. Of fifteen eligible employees who did not go, nine worked during the period the plant was closed. The employee who went later also worked during the period the plant was closed. The foregoing data and names of employees are detailed on Exhibit 'C' attached hereto and made a part hereof.

"*4.* All arrangements for the 1957 flight to Florida were made through March-Petzinger Travel Agency. All costs of the trip, including hotel bills (American Plan), sightseeing trips, transportation to and from airports and flight expenses were paid by March-Petzinger. The corporations paid March-Petzinger Travel Agency for all costs of the trips. The total cost of the 1957 trip was $15,757.19. The invoice from March-Petzinger Travel Agency detailing the expenses of the trip is attached hereto, made a part hereof, and marked Exhibit 'D.'

"*5.* In addition to the employees who went to Florida, seven wives of employees accompanied their husbands in 1956 and seven wives of employees accompanied their husbands in 1957. In each year each wife who made the trip paid $200.00, except that in 1957 Mrs. George Stavich paid only $100.00, to defray the additional room, board and transportation costs.

"*6.* In both 1956 and 1957 the corporations defrayed the cost of taking the corporations' attorney, his wife, one of the corporations' accountants and his wife on the trips."

*Supplemental Stipulation*

"MR. ADELSON: Paragraph 2 of the stipulation, it is indicated that the total cost of the 1956 trip was $17,715.41, as indicated on Exhibit B to the stipulation.

"This figure includes $3,600 given in cash to the employees which represents $75.00 per employee.

"The total cost also includes amounts given to the two individuals who went to Florida separately and not with the group, John Stavich and Edward Klempay.

"In paragraph 4 of the stipulation the total cost of the 1957 trip is indicated as $15,757.19. This figure includes $3,150 representing the $75.00 per employee given in cash to the employees and includes the amount $296.00 given to John Stavich who did not go to Florida with the group but went later. In one year John Stavich did not go to Florida but went to Maryland."

The two corporations involved herein are owned and controlled by the members of one family. The officers of the corporations are brothers and, although they hold various titles, they share more or less equally the responsibilities and duties necessary to conduct the business of the corporations.

In January of each of the years 1956 and 1957, Campbell Sash Works, Inc. and Calex Corporation defrayed the expenses of a one-week trip to Miami Beach, Florida, for certain of their employees. To be eligible an employee need merely have worked for the three months immediately preceding the trip, and it was not necessary that the employee exceed certain production marks or certain quotas in order to be eligible.

Substantial evidence was produced by the plaintiffs to the effect that the employees had been working long hours. During peak production periods the permanent employees worked sometimes as much as eighty and ninety hours a week (Tr. 13), and "in some cases they were working ten and twelve hours a day, six days a week." (Tr. 22.)

In the year 1955 the corporations reached peak production in the months

of September, October and November, and the same was true in 1956. The corporations normally curtailed their operations the middle of December, and the period of slowest production occurred in January and February of each year. (Tr. 12.)

The officers of the corporations made the following observations during the three months immediately preceding the Florida trips: (1) There was an increase in the number of rejects by customers, due to poor workmanship; (2) more than the normal amount of scrap was coming off of the production lines; and (3) there was an increase in absenteeism of some of the highly skilled employees.

The officers held meetings at which they discussed the cause, or causes, for the high number of rejects, the poor workmanship, the large amount of scrap, and the absenteeism. The officers concluded that their employees were tired as a result of working long hours, and they decided to close down their operations for a period of one week and send their employees to Florida for a rest and relaxation, anticipating that such a trip would serve to increase the efficiency of the employees. The corporations then entered into a contract with Capital Airlines, under the terms of which Capital Airlines, in January of 1956, supplied all of the items shown in defendant's Exhibit B attached to the stipulation of facts, and the corporations paid Capital Airlines the sum of $17,715.41, as shown on said Exhibit B. The same procedures were followed in January of 1957, except that the contract was not with Capital Airlines but was entered into between the corporations and March-Petzinger Travel Agency, of Youngstown, Ohio, and the corporations paid March-Petzinger the sum of $15,757.19, as shown on Exhibit D attached to the stipulation of facts.

The officers of the corporations, after deciding which employees would be eligible (to be eligible an employee need merely have worked for the three months prior to the trip), called the eligible employees together to inform them of the proposed trip. The corporations advised the eligible employees that they were free to choose between taking the Florida trip or not taking it. Whenever an employee appeared reluctant to take the trip, the corporations endeavored to persuade such employee to do so; however, the corporations did not force their employees to take the trip.

Eligible employees not taking the trips, as also the ineligible employees, received no compensation in lieu of making the trips.

Those eligible to receive the trips could not transfer their rights for any consideration in cash, gratis, or otherwise. The right to take the trips accrued only to those eligible and who elected to exercise their rights.

During the relevant one-week periods, the corporations' factories were closed for production.

Although the corporations considered and regarded the trips to Florida in each of the years involved as affording to their employees pleasure, rest and relaxation, and a means of rehabilitation, there were other factors considered in the corporations' decision to send the employees on these trips. The other factors considered were: (1) In late 1955, and again in late 1956, there was a shortage of skilled help which the corporations could utilize in their business; (2) the officers of the corporations believed that a trip to Florida for their employees would improve the status and position of the corporations in the employment market (Tr. 120); (3) in 1956 and again in 1957 a photographer from Ohio accompanied the employees on their trips to Florida, and photographs together with other publicity appeared in the newspapers and on television, and the corporations felt that this publicity would create a better image for the corporations in the employment market (Tr. 36, 129); and (4) the corporations felt that the 1956 and 1957 trips might serve to lessen the turnover rate among their personnel.

From the employees' standpoint, these Florida trips were solely for pleasure

and relaxation, in the nature of a vacation, and the corporations endeavored to provide the employees the "greatest pleasure possible on the trips." None of the employees transacted any business or performed any work for the employers while in Florida. (Tr. 65, 66.)

The plaintiffs Andrew Stavich (Case No. C–62–329), George Stavich (Case No. C–62–330), and Steve Stavich (Case No. C–62–332) accompanied the employees on the trips in question and performed many and various services, such as supervising games, pleasure trips and tours, giving instructions, and attending to the needs and welfare of the employees.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the subject matter and the parties hereto.

2. The primary purpose of the corporations' employees' trip to Florida was to take a pleasure trip in the nature of a vacation.

3. The fair market value of the income realized was the cost of the trips.

4. The fair market value of the employees' trips to Florida represented "wages" within the meaning of Sections 3121(a), 3306(b), and 3401(a) of the Internal Revenue Code of 1954.

5. The corporations were required to deduct and withhold income taxes and F.I.C.A. taxes. Sections 3402 and 3102 of the Internal Revenue Code of 1954.

6. The corporations were required to pay F.I.C.A. and F.U.T.A. taxes on the value of these trips. Sections 3302 and 3111 of the Internal Revenue Code of 1954.

7. The fair market value of the trips to Florida of Andrew, George and Steve Stavich represented additional income to them within the meaning of Section 61 of the Internal Revenue Code of 1954.

8. The primary purpose of plaintiffs George and Steve Stavich in going to Florida was to take a pleasure trip in the nature of a vacation and they are not entitled to a deduction for the cost of these trips.

9. In view of the activities in which Andrew Stavich engaged in connection with the employees' trips to Florida in each of the years in question, the Court concludes that he is entitled to a deduction for the cost of these trips.

10. The "vacation allowance" given to John Stavich in each of the years 1956 and 1957 represented additional income to him within the meaning of Section 61 of the Internal Revenue Code of 1954.

11. All findings of fact deemed to be conclusions of law are hereby concluded as a matter of law.

Judgment will be rendered in favor of the defendant and against the plaintiffs in cases Nos. 36935, 36936, C–62–330, C–62–331 and C–62–332. In case No. C–62–329 the plaintiff will be entitled to a deduction in an amount equal to the cost of the trips in each of the years in question.